IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dockside Associates/Pier 30, L.P.     :
    :
v.     :
    :
City of Philadelphia, Board of     :
Revision of Taxes     :
    :
Appeal of: Dockside Associates/     :     No. 2258 C.D. 2014
Pier 30, L.P. and Peter DePaul     :     Argued: October 5, 2015


BEFORE:     HONORABLE BERNARD L. McGINLEY, Judge
               HONORABLE MARY HANNAH LEAVITT, Judge[1]
               HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION
BY JUDGE McGINLEY                   FILED: January 15, 2016

## BACKGROUND & PROCEDURAL HISTORY

Dockside Associates/Pier 30, L.P. (Dockside) is the record owner of a property located at 717 South Christopher Columbus Boulevard, Philadelphia, Pennsylvania 19147. The property is located in a CMX-3 mixed-use district and zoned accordingly. A sixteen story building was constructed on the property. The building contains 242 residential units, one (1) commercial unit and three (3) stories used as a private parking garage. See November 3, 2014, Findings of Fact and Conclusions of Law of the Court of Common Pleas of Philadelphia (Trial

---

[1] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

Court Findings) at 1, Reproduced Record (R.R.) at 6a[2]; see also Trial Court Opinion at 2, R.R. at 15a; see generally Declaration of Condominium of Dockside Condominiums, 1-40, R.R. at 634a-678a.

Construction of the building was completed in September 2002, and the Dockside Condominium Association was formed April 4, 2006. On March 26, 2006, Dockside filed a declaration of condominium, which converted and subdivided the residential units into a condominium project. Notes of Testimony (N.T.), August 11, 2014, at 22-24, R.R. at 90a; Declaration of Condominium of Dockside Condominiums, 1-40, R.R. at 634a-678a.

.

Beginning in 2007, the Office of Property Assessment (OPA) in the City of Philadelphia (Philadelphia) assessed a separate market value for each of the residential units.[3] Trial Court Opinion at 3, R.R. at 16a. As a consequence of those assessed market values of each of the residential units for tax purposes, Dockside filed separate tax assessment appeals with OPA for each of the 153 units (152 residential units and the 1 commercial unit) *still owned* by Dockside after the 2007 assessments.[4] Trial Court Opinion at 1, 3, R.R. at 14a, 16a.

---

[2] The Reproduced Record in this matter consists of six (6) volumes (denoted as Volumes I-VI) and one (1) volume of a Supplemental Reproduced Record. The Reproduced Record volumes are numbered seriatim 1a-1606a. The Supplemental Reproduced Record is numbered 1b-255b. Volume references were omitted.

[3] The tax assessments on condominiums in the building began in 2007, the first tax year after the filing of the declaration of condominium in 2006.

[4] Ninety (90) residential units were sold by Dockside *prior* to OPA assessing each residential unit in 2007. Three (3) additional units were sold by Dockside (residential units 610, 715 and 802) before the March 25, 2013 appeal by Dockside to the Trial Court. However, Dockside never discontinued the four (4) appeals for the additional units sold. Consequently, Dockside only owned 149 of the units at the time this matter progressed to the Trial Court, not the 152 (residential) units reflected in Dockside's initial filings.

2

The property was inspected for Philadelphia by A. R. Hughes and Associates (Hughes) on January 11, 2013, with an effective valuation date for each of the residential units at the property as of December 31, 2013. Philadelphia's appraisal report listed a separate value for each of the 152 residential units at issue. Those residential units were assessed using a sales comparison approach (Sales Comparison) and highest-and-best-use of the residential unit analyses, wherein it was noted that the highest-and-best-use of each residential unit was to sell the residential units on the open market for residential owner-occupants. In addition, Philadelphia assessed the fair market value of the commercial unit at $4,524,600. See November 3, 2014 Order of the Trial Court, R.R. at 1a; see also N.T., August 11, 2014, at 17, R.R. at 89a.

On February 7, 2013, Harvey M. Levin (Levin), hired by Dockside, used a "fractured condominium"[5] model and an income capitalization approach to value (Income Capitalization) and produced a summary appraisal report for Dockside noting an implied market value for assessment purposes for the 2013 taxable year of $20,549.868. However, he appraised the property's value collectively at $14,965,000. Keystone Appraisal Company, Summary Appraisal Report of Harvey M. Levin, February 7, 2013; R.R. at 1106a.

Following Levin's appraisal report (for $14,965,000), Dockside filed a separate appeal with the Philadelphia Board of Revision of Taxes (Board) for

---

[5] *The Dictionary of Real Estate Appraisal* defines a fractured condominium as:
A residential condominium development or conversion project in which many units remain unsold; often a distressed property previously offered for sale as individual condominium units where the remaining units are remarketed as rental units and then sold as an apartment project. Sometimes the remaining units are sold in bulk at a discount. Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 78 (5th ed. 2010).

3

each residential unit and challenged the assessed market value from OPA. Following public hearings on February 21, 2013, the Board reviewed the evidence presented and on February 27, 2013, denied Dockside's proposed reductions to the 2013 assessed market values of the residential units.

Dockside thereafter appealed the Board's decision to the Trial Court, which heard argument and testimony over the course of four days in August 2014.[6] On November 3, 2014, the Trial Court (Trial Court Opinion) denied Dockside's appeal and upheld the assessed fair market values of the residential units using the Sales Comparison approach as provided by Philadelphia.[7] Trial Court Opinion at 8; R.R. at 13a.

This appeal followed.

## ISSUES

Before this Court, Dockside essentially argued[8]: 1) that the Trial Court improperly gave deference to Philadelphia's opinion of value instead of conducting a *de novo* review; 2) that the Trial Court used the improper taxation approach in assessing the residential units; and 3) that the Trial Court erred by prohibiting Dockside from using the prior appraisals of Philadelphia's expert for impeachment

---

[6] Testimony was heard on August 11, 2014, August 12, 2014, August 15, 2014, and August 25, 2014.

[7] Since none of the parties involved presented any values for the commercial unit, the Trial Court ordered that its value remained as originally assessed by the OPA.

[8] This Court's scope of review in a tax assessment appeal is whether the trial court abused its discretion, committed an error of law, or whether its decision is supported by substantial evidence. Cedarbrook Realty, Inc. v. Cheltenham Twp., 611 A.2d 335, 340 (Pa. Cmwlth. 1992).

purposes wherein he made inconsistent statements in those prior appraisals regarding the proper method for appraising the property.

### *De Novo* **Review**

Dockside identified that the Trial Court was charged with arriving at the fair market value of the residential units based upon "competent, credible and relevant evidence." Craftmaster Manufacturing, Inc. v. Bradford County Board of Assessment Appeals, 903 A.2d 620, 625 (Pa. Cmwlth. 2006). Dockside noted that where a taxpayer's evidence "is relevant, credible and un-rebutted, the court must give it due weight and cannot ignore it in determining a property's fair market value." Koppel Steel Corporation v. Board of Assessment Appeals of Beaver County, 849 A.2d 303, 307 (Pa. Cmwlth. 2004). If the taxing authority presented rebuttal evidence, "the court must determine the weight to be given all the evidence." Koppel, 849 A.2d at 307.

In the current controversy, Dockside argued that the Trial Court offered "no meaningful analysis" regarding its decision to accept Hughes' expert opinion and reject Levin's expert testimony. Dockside argued that the Trial Court applied a *de facto* presumption that Philadelphia's valuation of the residential units, based upon the Sales Comparison approach, was correct simply because "it was utilized by [Philadelphia] and is consistent with [Philadelphia's] usual procedures." Dockside's Brief at 22.

Thus, Dockside argued that Philadelphia first had to establish a *prima facie* case by entering the official assessment record into evidence. The burden then shifted to Dockside to present "sufficient competent, credible and relevant

5

evident of the fair market value of the property of the property to overcome the *prima facie* case." Koppel, 849 A.2d at 307.

Dockside asserted that the Trial Court erred in finding that the Sales Comparison approach was appropriate simply because that was the approach that Philadelphia "always uses" to evaluate residential condominium units, irrespective of whether the condominium project was distressed or fractured. See Dockside's Brief at 28.

Dockside argued that the Trial Court abused its discretion in this controversy because it reached a conclusion which "overrides or misapplies the law, or [because] the judgment exercised [was] manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." Middletown Township v. Lands of Stone, 939 A.2d 331, 335 n.3 (Pa. 2007) (regarding eminent domain of a family farm for recreational purposes).

Concomitantly, regarding the admission or exclusion of evidence, Philadelphia asserts that Pennsylvania courts have long held:

> [t]hese matters are within the sound discretion of the trial court, and [the court on appeal] may reverse only upon a showing of abuse of discretion or error of law. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

6

Zuk v. Zuk, 55 A.3d 102, 112 (Pa. Super. 2012) (citation omitted); see also Expressway 95 Business Center, L.P. v. Bucks County Board of Assessment, 921 A.2d 70, 76 (Pa. Cmwlth. 2007) (citation omitted) (when performing a *de novo* review, the trial court as fact-finder maintains exclusive province concerning the credibility of witnesses and the weight afforded the evidence); Appeal of Cynwyd Investments, 679 A.2d 304, 309 (Pa. Cmwlth. 1996) *petition for allowance of appeal denied,* 685 A.2d 549 (Pa. 1996); Willow Valley Manor, Inc. v. Lancaster County Board of Assessment Appeals, 810 A.2d 720, 724 (Pa. Cmwlth. 2002) (trial court's findings are entitled to great deference and will not be disturbed absent clear error).

In the current controversy, the Trial Court's opinion discussed Philadelphia and Dockside's evidence presented at trial in detail:

> Testimony presented established that the OPA assesses condominium units based on a sales comparison approach. N.T. 8/11/14 at 22-23; 33. A condominium unit is considered a separate property with a separate tax identification number, and regardless of how many condominium units a single owner possesses, each is assessed with its own fair market value. N.T. 8/11/14 at 24. The [residential units] have been assessed as single units since 2007. N.T. 8/11/14 at 25. The OPA relies upon comparable sales in determining the market values of individual units. N.T. 8/11/14 at 33. The 2013 assessed value had a predetermined ratio of 32% …. N.T. 8/11/14 at 26. Dockside objected to the fact that the OPA assessor had not personally visited the Dockside Condominiums, but had only driven by them. N.T. 8/11/14 at 36-38.
>
> Dockside presented testimony that in 2006 and 2007, it had sold sixty-one (61) condominium units. N.T. 8/11/14 at 50. However, beginning in 2008 until the present day, it has sold forty-two (42) condominium units, on average six (6) units per year. N.T. 8/11/14 50. In total, it has sold one hundred and

7

three (103) units out of a total of two hundred and forty-two (242) units.  N.T. 8/11/14 at 53. Six (6) of those sales were in 2013 and several were for significantly more money than Dockside's proposed market values. N.T. 8/11/14 at 93.  For example, Unit 1020, allocated a market value $118,138 by Dockside's method, sold on May 6, 2013 for $625,462. N.T. 8/12/14 73-74, 77.

Levin testified for Dockside that the instant case was "the first fractured condominium that has been appraised in this part of the country."  N.T. 8/11/14 at 107.  Using an [Income Capitalization] approach, Levin examined the history of the property, operating statements, typical leases, floor plans, etc. N.T. 8/11/14 at 116-119.  He utilized the [Income Capitalization] approach due to the "nature, character, and history of Dockside;" this involves looking at the gross income attributed to the building and conducting appropriate expenses to arrive at the net operating income, finding the capitalization rate, and dividing income by rate to yield an indication market value. N.T. 8/11/14 at 120, 136.  Levin valued the Dockside units as "one property, a fractured condominium, with the value indicated by sales ...[and] the contribution that each made to operating the income of  the entire building."  N.T. 8/11/14 at 127.

Levin concluded that the net operating income was $1,964,00.00.  N.T. 8/11/14 at 140.  He used an overall capitalization rate of 113/4. N.T. 8/11/14 at 141.  Thus, he concluded that the fair market value of the unsold units was $14,965,000 for the taxable year 2013 and $17,500,000 for the taxable year 2014. N.T. 8/11/14 at 141-142.  Levin averred that, in a fractured condominium, there are "no sales" and therefore no comparables. N.T. 8/11/14 at 150.  Levin averred that Dockside would be "stuck" with the unsold units for a very long time, and that it could take as long as twenty (20) years to achieve a sellout of all units.  N.T. 8/12/14at 82-83.

[In rebuttal, Philadelphia presented] the expert testimony of John Rush (Rush), a certified real estate appraiser, who came to

the conclusion that the opinions of value expressed by Levin were not credible, based upon his reading of the report; his experience; and his general knowledge of the real estate market. N.T. 8/15/14 at 15, 17. Rush testified that [Philadelphia] uses the Sales Comparison approach, which is an "evaluation technique wherein the appraiser collects data concerning the sales comparable properties, makes adjustments to that data said [sic] for the differences between comparable sales and [the residential units]. After the adjustment process has been completed, the data should point to what the value of the estate should be. N.T. 8/15/14 at 20. This is a common method for appraising units. N.T. 8/15/14 at 15.

Rush, who had performed valuations of fractured condominium units, expressed concerns over Levin's lack of presentation of market data, i.e. comparable property rents being received from the marketplace, discussion and analysis of vacancy rates comparable to the marketplace and analysis and discussion of operating expenses based upon that of similar properties. N.T., 8/15/14 at 24. Rush stated that even with the [I]ncome [C]apitalization method, the overall capitalization rate should be derived from the market for a market value opinion. N.T. 8/15/14 at 24. Rush opined that normally, in such a case, to remain consistent with the valuation technique, the appraiser would have collected and performed an analysis for the rest of comparable properties in the area. N.T. 8/15/14 at 31-32. Additionally, Rush testified that the report was inaccurate with regard to its vacancy projection because in his practice of appraising multifamily dwellings, the general market vacancy was nowhere near twenty (20) percent. N.T. 8/11/14 at 46. He recommended that [Philadelphia] not rely upon the Levin appraisal as an indication of value. N.T. 8/15/14 at 62.

Albert R. Hughes, III ("Hughes"), real estate appraiser, [also] testified for [Philadelphia] that each [residential] unit, upon creation, is assigned an individual tax identification number. N.T. 8/15/14 at 104. Each [residential] unit is considered a separate property saleable unto itself. N.T. 8/15/14 at 104. Hughes appraised one hundred fifty-two (152) [residential

9

units] in the Dockside building as individual [residential] units and completed an appraisal report. N.T. 8/15/14 at 105. Hughes defined market value as "the price which the purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." N.T. 8/15/14 at 109. In performing the appraisal, Hughes used sales as well as resales in several local condominium projects along the Philadelphia waterfront. N.T. 8/15/14 at 125-128. Hughes determined the highest and best use of the [residential] units was residential occupancy and future sales to the end user, and to come to this conclusion he considered: legal permissibility; physical possibility; financial feasibility; and maximum productivity. N.T. 8/15/14 at 130-131.

Hughes also testified that a number of other residential [] units, including Society Hill Towers and Pier Three Condominiums, are within a mile of Dockside; [that] the South Street overpass is quite close to Dockside, as well as grocery stores and shopping between one and one quarter miles from the propert[y]. N.T. 8/15/14 112-113, 126-128.

In a surrebuttal, John Hosey ("Hosey") testified for Dockside that he found Rush's report inaccurate as to the assessment of fractured condominiums because apartment building sales are irrelevant to a fractured condominium analysis. N.T. 8/25/14 at 15-16, 24. *Hosey felt that Levin's report was as complete as possible.* (Emphasis added.) N.T. 8/25/14 at 16.

Where the taxpayer's testimony is relevant, credible and un-rebutted, the court must give it due weight and cannot ignore it in determining a property's fair market value. Koppel, 849 A.2d at 307 (citations omitted). However, where the taxing authority presents rebuttal evidence, the court must determine the weight to be given all the evidence. Koppel, 849 A.2d at 307.

10

In the current controversy, it is evident that Dockside presented relevant and credible testimony in support of its position. Thereafter, Philadelphia presented rebuttal evidence, which was also weighed by the Trial Court. The trial court, as fact-finder, maintained exclusive province concerning the credibility of witnesses and the weight afforded that evidence. Zuk v. Zuk, 55 A.3d at 112.

As cited above, the Trial Court thoroughly reviewed the evidence presented by both parties, clearly evaluated it in great length in its opinion, and thereby removed all doubt in this Court's mind that it overrode or misapplied the law, or exercised manifestly unreasonable judgment, resulting in partiality, prejudice, bias or ill-will. Middletown Township v. Lands of Stone, 939 A.2d 331, 335 n.3 (Pa. 2007). The Trial Court arrived at the fair market value of the residential units based upon a *de novo* review of the competent, credible and relevant evidence. See Craftmaster, 903 A.2d at 625; Koppel, 849 A.2d at 307.

**Taxation Approach**

Dockside next argued that the Trial Court erred when it adopted the Sales Comparison appraisal method for taxation purposes of the residential units advocated by Philadelphia rather than the Income Capitalization appraisal method for taxation purposes utilized by Dockside's expert witness.

Dockside asserted that the Income Capitalization appraisal method was the approach to take to assess the residential units for purposes of taxation. Dockside noted that Income Capitalization is "[a] set of procedures through which an appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property value." *The Dictionary of Real Estate Appraisal*, 143 (4th ed. 2002). Dockside asserted

11

that in determining fair market value of the residential units, it is well-settled that value assigned to those units must be based upon the particular facts and circumstances of the subject property as well as relevant market conditions. See Mack Trucks, Inc. v. Lehigh County Board of Assessment Appeals, 692 A.2d 661, 663 (Pa. Cmwlth. 1997).

Dockside further asserted that the concept of a fractured condominium was well-recognized in the real estate appraisal industry. Dockside argued that the fractured condominium analysis applied by its expert, Levin, was not a separate approach to real estate valuation, but simply part of a *particular factual context* that supported application of the familiar Income Capitalization appraisal method, which has been applied by Pennsylvania courts in tax assessment cases, where the highest-and-best-use of property was as income producing property.[9]

Dockside argued that they presented unrebutted evidence that the property that encompassed the residential units in issue was a distressed or fractured condominium project. Dockside asserted that none of the witnesses who testified argued that the concept of a fractured condominium project was not recognized by real estate appraisers or disagreed that Dockside met the definition of a fractured condominium. Dockside further asserted that they presented

---

[9] See, e.g., In re Appeal of Marple Springfield Center., Inc., 607 A.2d 708 (Pa. 1992) (upholding utilization of income capitalization approach to determine value of shopping center with long-term, restrictive lease); In re Appeal of V.V.P. Partnership, 647 A.2d 990 (Pa. Cmwlth. 1994) (upholding utilization of income capitalization approach to determine value of tennis club); Cedarbrook Realty, Inc. v. Cheltenham Twp., 611 A.2d 335, 345 (Pa. Cmwlth. 1992) (remanding so that trial court could give greater weight to income capitalization approach to value unique residential property development). See also 1198 Butler Street Associates v. Board of Assessment Appeals, County of Northampton, 946 A.2d 1131, 1140 (Pa. Cmwlth. 2008) ("A court must consider the economic realties [*sic*] associated with property when assessing its fair market value.").

12

substantial evidence that the highest-and-best-use for the units was as a fractured condominium.[10]

Further, Dockside argued that the requirement in Section 3105 of the Uniform Condominium Act[11] (UCA) that each residential (condominium) unit must be valued in isolation, rather than as part of an "integrated economic unit", is not a hard-and-fast rule. Dockside's Brief at 43. Dockside asserted that it was perfectly appropriate for an appraiser to recognize the market forces of supply and demand, which were impacted by the number of total residential units owned by an individual in assessing the value of *each* unit. Dockside's Brief, at 43-44. Thus, Dockside asserted that its appraisal did not ignore the UCA, but rather, recognized the economic reality that Dockside's ownership of the residential units in a fractured condominium project depresses the value of each residential unit. Koppel, 849 A.2d 303; see also Dockside's Brief p. 44.

In Koppel, the taxpayer owned 211 separate parcels of contiguous real estate in Beaver County, Pennsylvania. The taxpayer's expert assessed those

---

[10] The residential units should be offered for bulk sale or the continuation as residential rental units, which will yield the highest net return. N.T., August 11, 2014, at 123, 134-136, R.R. at 115a, 118a.

[11] 68 Pa .C.S. §§3101-3414.
Section 3105 of the UCA states, in pertinent part:
> (a) Title. -- Except as provided in subsection (b), each unit together with its common element interest constitutes for all purposes a separate parcel of real estate.
> (b) Taxation and assessment. -- If there is a unit owner other than a declarant, each unit together with its common element interest . . . shall be separately taxed and assessed . . . ; otherwise, the real estate comprising the condominium may be taxed and assessed in any manner provided by law.

68 Pa.C.S. § 3105.

13

parcels as an "integrated economic unit". The trial court in <u>Koppel</u> rejected that valuation and accepted the valuation of the taxing authority's expert on the basis that he had assigned a value to each individual parcel. In reversing the trial court's order, this Court found that "the trial court erred in rejecting the valuation of [the taxpayer's] appraiser on ground that the appraiser considered the eleven parcels as an integrated economic unit." <u>Koppel</u>, 849 A.2d at 305.

Thus, Dockside argued that by the same reasoning in the current controversy, it is clear that an accurate appraisal of each residential unit can - and should - consider the *total* number of units owned by Dockside in a single fractured condominium project in determining the value of each residential unit.

Conversely, Philadelphia argued that the Sales Comparison approach was the best way to show the highest-and-best-use for each individual residential unit. N.T., August 15, 2014, at 131-132, R.R. at 200a; Philadelphia's Brief, at 44. Philadelphia argued that in tax assessment appeals, a trial court must "independently determine the fair market value of the parcel on the basis of the competent, credible and relevant evidence presented by the parties." <u>Green v. Schuylkill County Board of Assessment Appeals</u>, 772 A.2d 419, 426 (Pa. 2001) (quoting <u>Westinghouse Electric Corp. v. Board of Property Assessment</u>, 652 A.2d 1306 (Pa. 1995)) (citations omitted). Philadelphia argued that for real estate assessment purposes, residential (condominium) units are to be valued as separate and distinct properties and not as a single property. <u>Cunius v. Board of Assessment Appeals of Chester County</u>, 976 A.2d 635 (Pa. Cmwlth. 2009); <u>see also</u> Philadelphia's Brief, p. 17.

14

In Cunius, a father and son (the Cuniuses) owned an apartment building as tenants in common. Cunius, 976 A.2d at 636. The Cuniuses converted and divided the building. Cunius, 976 A.2d at 636. Unit 1 consisted of forty-four (44) apartments and was exclusively owned by the father. Cunius, 976 A.2d at 636. Unit 2 consisted of twenty-four (24) apartments and was exclusively owned by the son. Cunius, 976 A.2d at 636. After the declaration of the condominium was filed, the local assessment board assigned individual tax parcel numbers to Units 1 and 2 and assessed them separately, resulting in a higher aggregate value than when the properties were legally defined as an "apartment building". Cunius, 976 A.2d at 636. The Cuniuses appealed the two assessments. At trial the Cuniuses presented evidence demonstrating that the building was not physically changed in any manner and that the declaration of condominium represented only a change in the form of ownership. Cunius, 976 A.2d at 636. The Cuniuses asserted, *inter alia*, that "the tax authority should have apportioned the prior assessment […] between each [U]nit based upon its percentage of ownership of the total property." Cunius, 976 A.2d at 636 n. 5 and 641.

In response to the Cuniuses' arguments, this Court stated that the procedure "is illogical and contrary to the Assessment Law."[12] Furthermore, it could "discern no logical basis for interpreting the [UCA] to require the assessment board to assign a new tax parcel number and tax assessment to each [residential] condominium unit but prohibit the determination of actual or current market value." Cunius, 976 A.2d at 641.

---

[12] Act of June 26, 1931, P.L. 1379, *as amended,* 72 P.S. §§ 5342–5350k.

15

In the current controversy, Philadelphia further argued that at least fourteen (14) other jurisdictions have enacted the UCA in their states.[13] Philadelphia asserted that at least three (3) courts in other UCA states have addressed the UCA's tax provision and each has interpreted that provision to require a residential (condominium) unit, regardless of ownership, *to be treated separately from all other units in the condominium project.*[14]

Philadelphia asserted that this Court previously held that the Trial Court's duty in an assessment appeal is to weigh the conflicting expert testimony and determine a value based upon credibility determinations. The trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property. Church Street Associates v. County of Clinton Board of Assessment Appeals, 959 A.2d 490, 495 (Pa. Cmwlth. 2008) (citing Willow Valley Manor, Inc. v. Lancaster County Board of Assessment, 810 A.2d 720, 722-23 (Pa. Cmwlth. 2002).

Philadelphia also called this Court's attention to the fact that "the Trial Court's resolution of the conflicts within the two experts' testimony, as well as the weight assigned respectively thereto and the credibility determinations

---

[13] See Ala. Code § 35-8A-105; Ariz. Rev. Stat. Ann. § 33-1204; Ky. Rev. Stat. Ann. § 381.9109; La. Rev. Stat. Ann. § 9:1121.105; Me. Rev. Stat. tit. 33, § 1601-105; Minn. Stat. Ann. § 515.22; Mo. Ann. Stat. § 448.1-105; Neb. Rev. Stat. § 76-829; N.H. Rev. Stat. Ann. § 356-B:4; N.M. Stat. Ann. § 47-7A-5; N.C. Gen. Stat. Ann. § 47C-1-105; Wash. Rev. Code Ann. § 64.34.040; Tenn. Code Ann. § 66-27-205; Tex. Prop. Code Ann. § 82.005; R.I. Gen. Laws Ann. § 34-36.1-1.05. Philadelphia's Brief, p. 20.

[14] Arizona, Maine and Rhode Island. See E.C. Garcia & Company, Inc. v. Arizona State Department of Revenue, 875 P.2d 169, 176 (Az. App. 1993); Crystal Point Joint Venture v. Arizona Department of Revenue, 932 P.2d 1367, 1371-72 (Az. Ct. App. 1997); Quiland, Inc. v. Wells Sanitary District, 905 A.2d 806, 812-13 (Me. 2006); See Inn Group Associates v. Booth, 593 A.2d 49, 52 (R.I. 1991); see also, Philadelphia's Brief, p. 20, n. 8.

16

thereof, control on appeal." Church Street Associates, 959 A.2d at 495 (citations omitted).

Philadelphia noted that significant evidence was provided in the record to support its expert's conclusions in that the expert provided dates, sales prices, size and location for the 25 residential units that were, in fact, sold since 2010 within the condominium project as a whole. N.T., August 15, 2014, at 133, R.R. at 201a; see also Philadelphia's Brief, at 44. Philadelphia further noted that at trial, its expert utilized "hundreds" of other comparable sales from competitive condominium projects to support his opinion of market value. Appraisal Report on 152 Condominium Units at the Residences at Dockside at 42-62, R.R. at 1356a-1376a; see also Philadelphia's Brief, at 44.

Finally, Philadelphia argued that Pennsylvania's Constitution states, in pertinent part, that "all taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax . . ."[15] and requires "that a taxpayer should pay no more or no less than his proportionate share of the cost of government." Hromisin v. Board of Assessment, 719 A.2d 815, 818 (Pa. 1998) (quoting Deitch Company v. Board of Property Assessment, 209 A.2d 397, 401 (Pa. 1965)). This principle requires that taxpayers pay their proportionate share based on the same ratio of assessed value to market value. Clifton v. Allegheny County, 969 A.2d 1197, 1214 (Pa. 2009) (citing Downingtown Area School Dist. v. Chester County Board of Assessment Appeals, 913 A.2d 194, 199 (Pa. 2006)).

---

[15] PA. CONST. Art. VIII, § 1.

17

Consequently, Philadelphia asserted that this method ensures that both large property owners and small property owners pay property taxes upon the same ratio. Delaware, L. & W. R. County's Tax Assessment, 73 A. 429 (Pa. 1909).

At the outset of examination of the arguments of both parties, this Court examines its holding in Koppel. As this Court noted:

> [t]he taxing authority first presents its assessment record into evidence, making out a *prima facie* case for the validity of the assessment. The burden shifts to the taxpayer to present sufficient competent, credible and relevant evidence of the fair market value of the property to overcome the *prima facie* case for the validity of the assessment. If the taxpayer does so, the taxing authority can no longer rely solely on the assessment record in the face of countervailing evidence unless it is willing to run the risk of having the taxpayer's proof believed by the court. Where the taxpayer's testimony is relevant, credible and un-rebutted, the court must give it due weight and cannot ignore it in determining a property's fair market value. Where the taxing authority [thereafter] presents rebuttal evidence, the court must determine the weight to be given all the evidence.

Koppel, 849 A.2d at 307; see also Deitch Company v. Board of Property Assessment, Appeals and Review of Allegheny County, 209 A.2d 397 (Pa. 1965).

This Court reversed the trial court in Koppel, holding that "the trial court erred in rejecting the valuation of [the taxpayer's] appraiser on the ground that the appraiser considered the eleven [11] parcels as an integrated economic unit." Koppel, 849 A.2d at 305. In other words, the taxpayer presented sufficient, competent, credible and relevant evidence to overcome the taxing authority's *prima facie* case. Then, after the trial court denied the taxing authority's motion to dismiss the tax assessment appeal, the taxing authority presented expert valuation

18

testimony in rebuttal. Faced with the conflicting evidence, the trial court was required to weigh the evidence in order to determine the fair market value of the taxpayer's eleven parcels.

Although the trial court in Koppel held that the expert testimony of the taxpayer was not credible, the trial court did not question the personal veracity of the expert witness but rather, rejected the testimony based on an improper legal assumption. Hence, the trial court *failed to weigh* the conflicting evidence. These circumstances make this Court's holding in Koppel distinguishable from the current controversy.[16]

In the matter at hand, the Trial Court observed that "the issue before the [Trial] Court is a narrow one: which method of calculation was correct." Trial Court Opinion at 8; R.R. at 21a. The Trial Court noted that "Dockside presented exhaustive testimony … [but] they [sic] offered no real authority regarding the appropriateness of a 'fractured condominium' and income capitalization approach as opposed to [Philadelphia's] method, utilizing a [S]ales [C]omparison approach…." Trial Court Opinion at 8; R.R. at 21a.

The Trial Court continued and noted:

Dockside argued that there were no comparable sales because Dockside is isolated; however, [Philadelphia] presented testimony that comparable properties, including the Society Hill Towers, were not far away; additionally, Hughes testified that the South Street overpass

_____

[16] See also Mack Trucks, Inc., 692 A.2d 661 (in determining fair market value, it is well-settled that value must be based upon the particular facts and circumstances of the subject property and relevant market conditions).

19

is quite close, as well as grocery stores and shopping between one and one quarter miles from the properties. N. T. 8/15/14 at 112-113, 126-128.

Trial Court Opinion at 9; R.R. at 22a.

In further evaluating the evidence, the Trial Court stated that "[u]ltimately, Dockside could not provide authority as to why this [Trial] Court should ignore the [UCA, which also defined] each [residential unit] as a separate parcel to be taxed and assessed separately….Additionally, following direct examination of … Levin and rebuttal testimony from … Rush, this [Trial] Court did not find Dockside's expert assessment evidence reliable or credible." Trial Court Opinion at 9; R.R. at 22a.

Thus, examination by this Court of the particular facts and circumstances of the current controversy, clearly evidenced that the Trial Court *did weigh, at length,* the facts and conflicting evidence when it made its determination. This Court's holding in Koppel is distinguishable.

This Court is mindful that a trial court must determine the fair market value of a property on the basis of the competent, credible and relevant evidence presented by the parties. Green, 772 A.2d 419. This Court is also cognizant of the fact that a trial court's resolution of the conflict of opinions by various experts, the weight assigned respectively thereto, and the credibility determinations thereof, control on appeal. Church Street Associates, 959 A.2d 490.

Therefore, in furtherance of this review, and keeping in mind the holdings of Green and Church Street Associates, as well as being mindful that the trial court has the discretion to decide which of the methods of valuation is the

20

most appropriate and applicable to the given property,[17] Philadelphia clearly presented significant evidence in the form of dates, sales prices, sizes and locations for the twenty-five (25) residential units that were sold within this property as a whole since 2010, that supported its expert's opinion of market value.

In addition, as identified by Philadelphia, at least fourteen (14) other jurisdictions have enacted the UCA in their states and three (3) courts in other UCA states have addressed the UCA's tax provision, with each interpreting that tax provision to require a residential (condominium) unit, regardless of ownership, to be treated separately from all other units in the condominium project.

Thus, while Dockside may have believed and asserted that its ownership of the residential units was within a fractured condominium project, which therefore depressed the value of each residential unit within that project, Dockside neither provided credible evidence, or authority as to why neither the Trial Court or this Court should ignore the UCA, which defines each residential unit as a separate parcel to be taxed and assessed separately.[18]

So, being mindful that the Trial Court had the discretion to decide which of the methods of valuation was the most appropriate and applicable to the given property as long as it was based upon the competent, credible and relevant evidence presented by the parties, and being cognizant of the fact that a trial court's resolution of the conflict of opinions by various experts, the weight

---

[17] Church Street Associates, 959 A.2d 490.

[18] See also Trial Court Opinion at 7.

assigned respectively thereto, and the credibility determinations thereof, controls on appeal as long as the court provided meaningful analysis of the evidence. The Trial Court's findings are entitled to great deference and will not be disturbed absent clear error. Consequently, this Court finds that the Trial Court did not err when it chose the Sales Comparison taxation approach it did when it assessed the value of each condominium separately.

## Exclusion of Prior Appraisals

Dockside also argued that the Trial Court erred when it prohibited Dockside from including the prior appraisals of the property created by Hughes for other clients in the certified record and prohibited Dockside from using them to impeach Hughes.

Dockside asserted that Hughes, the expert for Philadelphia, appraised the property for another client, wherein Dockside asserted that Hughes offered "a far different spin, characterizing Dockside's neighborhood as an 'island'…that 'would never be allowed today'." Dockside's Brief at 54, n.9; see also Dockside's Reply Brief at 12-16.

Dockside further asserted that Hughes' prior appraisals were not offered to establish the value of the residential units, but rather to demonstrate that statements that were made by Hughes to support his valuation were directly inconsistent with statements that he made previously about the property. Dockside's Reply Brief at 13.

In support, Dockside argued that Pennsylvania Rule of Evidence 613(a) permitted the impeachment of a witness's credibility through the use of a

22

prior inconsistent statement made by that witness.[19]  Thus, argued Dockside, that "it is hornbook law" that a witness's credibility may be impeached by prior inconsistent statements.  Leaphart v. Whiting Corporation, 564 A.2d 165, 172 (Pa. Super. 1989); see also Dockside's Brief at 49.  Dockside further argued that "[a] party may impeach the credibility of an adverse witness by introducing evidence that the witness has made one or more statements inconsistent with his trial testimony."  Commonwealth v. Bailey, 469 A.2d 604 (Pa. Super. 1983).

In response, Philadelphia argued that Hughes' prior appraisals did not value the individual residential units of the property for real estate tax purposes. Rather, Hughes created those appraisals under different circumstances, for evaluation of the entire building, and were created for mortgage purposes. Dockside Brief at 48.[20]  Philadelphia asserted that the prior appraisals did not provide values for the residential units.  Consequently, they were not relevant in the matter under review.

Philadelphia further argued that Hughes appraised 152 residential units for real estate tax purposes in accordance with the UCA for their market value.  Whereas, Hughes' prior appraisals valued the property, as a whole, for *liquidation purposes* in the event that the bank was required to foreclose.

---

[19] Pa. Rule of Evidence 613(a) provides in pertinent part:

(a)  **Witness's Prior Inconsistent Statement to Impeach.**  A witness may be examined concerning a prior inconsistent statement made by the witness to impeach the witness's credibility.

[20] Hughes' prior appraisals were created to "evaluat[e] the project," or the financial feasibility of "the property."  R.R. at 260a, N.T. August 21, 2114, at 16; R.R. at 100a, N.T., August 11, 2014, at 64.

23

A party may impeach a witness's credibility on cross-examination through previous statements inconsistent with those made at trial. Bailey, 469 A.2d 604. Further, the trial court is vested with authority to "limit the scope and extent of cross-examination." Pittsburgh-Des Moines Steel Co., Inc. v McLaughlin, 466 A.2d 1092, 1097 (Pa. Cmwlth. 1983).

This Court agrees with Dockside's assertion that in order for prior inconsistent statements to suffice as impeachment evidence, those dissimilarities "must be substantial enough to cast doubt on a witness's testimony" Bailey, 469 A.2d at 611.

This Court also agrees with Dockside's argument that the only reason offered by the Trial Court in its opinion for its decision to exclude Hughes' potential impeachment was because the prior appraisals were not relevant as they were "not made for a tax assessment." Trial Court Opinion at 10.

"[A] trial court has exclusive province over all matters of credibility ... and its findings will not be disturbed if they are supported by substantial evidence in the record." Aetna Life Insurance Co. v. Montgomery County Board of Assessment. Appeals, 111 A.3d 267, 279 (Pa. Cmwlth. 2015) (citation omitted). This Court is reminded of Dockside's earlier assertion in support of their Taxation Approach argument -- in determining fair market value of the residential units, it is well-settled that value assigned to those units *must be based upon the particular facts and circumstances of the subject property*. See Mack Trucks, Inc., 692 A.2d 661, 663; see also Dockside's Brief at 31. (Emphasis added.)

This Court agrees with Dockside's assertion that the "only reason offered" by the Trial Court in its opinion when it excluded Hughes' prior appraisals from impeachment evidence was because they were "not made for a tax assessment". Unfortunately for Dockside, this Court finds no error in the Trial Court's reasoning.

However, those Trial Court findings will not be disturbed if they are supported by substantial evidence in the record. The Trial Court's words regarding Hughes' prior appraisals -- that the appraisals were "not made for a tax assessment" were enough. Those few words, that precise *reason,* was reason enough to exclude Hughes' prior appraisals. For dissimilarities must not only cast doubt on a witness's testimony, but those dissimilarities *must relate to the same concept or issue*. Put another way, assertions must be based upon the particular facts and circumstances of the subject property. See Mack Trucks, Inc., 692 A.2d 661, 663; see also Dockside's Brief at 31. Here, the statements made by Hughes, in his previous appraisals, relate to a *different concept* and addresses a *different issue* and were properly excluded by the Trial Court.

For reasons heretofore set forth in the Court's opinion Philadelphia's Application For Relief To Suppress In Part Dockside's Brief And For Reasonable Attorney's Fees is denied.

This Court affirms the decision of the Trial Court.

_____
BERNARD L. McGINLEY, Judge

Judge Covey did not participate in the decision in this case.

25

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dockside Associates/Pier 30, L.P.   :
                                            :
                     v.                   :
                                            :

City of Philadelphia, Board of      :
Revision of Taxes                      :
                                            :

Appeal of:  Dockside Associates/   :    No. 2258 C.D. 2014
Pier 30, L.P. and Peter DePaul   :

## **O R D E R**

AND NOW, this 15th day of January, 2016, and pursuant to the reasons heretofore set forth in our Opinion in the above-captioned matter, Philadelphia's Application For Relief To Suppress In Part Dockside's Brief And For Reasonable Attorney's Fees in the above-captioned matter is denied.

Further, the order of the Court of Common Pleas of Philadelphia in the above-captioned matter is affirmed.

 

_____
BERNARD L. McGINLEY, Judge